**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| LAURIE BROWN; OLUWAKEMI FOSUDO; and ABIGAIL MUSICK, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br>     v.<br><br>WALMART, INC.,<br><br>        Defendant. | Case No. 5:24-cv-05144-TLB |

## CLASS ACTION COMPLAINT

Laurie Brown ("Plaintiff Brown"), Oluwakemi Fosudo ("Plaintiff Fosudo"), and Abigail Musick ("Plaintiff Musick") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, make the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to allegations pertaining specifically to themselves or their counsel, which are based on personal knowledge.

## NATURE OF THE CASE

1.     Plaintiffs bring this action to redress Defendant Walmart, Inc.'s practices of knowingly disclosing Plaintiffs' and its other customers' identities and the titles of the prerecorded video materials that they purchased to Meta Platforms, Inc. ("Meta"), formerly known as Facebook, Inc. ("Facebook"), in violation of the federal Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

2.     Over the past two years, Defendant has systematically transmitted (and continues to transmit today) its customers' personally identifying video viewing information to Meta using a snippet of programming code called the "Meta Pixel," which Defendant chose to install on its walmart.com website.

3.      The information Defendant disclosed (and continues to disclose) to Meta via the Meta Pixel it installed on its website includes the Facebook ID ("FID") and the title of the specific prerecorded video material that each of its customers purchased on its website. An FID is a unique sequence of numbers linked to a specific Meta profile . A Meta profile, in turn, publicly identifies by name the specific person to whom the profile belongs (and also contains other personally identifying information about the person). Entering "Facebook.com/[FID]" into a web browser returns the Meta profile of the person to whom the FID corresponds. Thus, the FID identifies a person more precisely than a name, as numerous persons may share the same name, but each person's Facebook profile (and associated FID) uniquely identifies one and only one person. In the simplest terms, the Meta Pixel installed by Defendant captures and discloses to Meta information that reveals the specific videos that a particular person purchased on Defendant's website (hereinafter, "Private Viewing Information").

4.      Defendant disclosed and continues to disclose its customers' Private Viewing Information to Meta without asking for, let alone obtaining, their consent to these practices.

5.      The VPPA clearly prohibits what Defendant has done. Subsection (b)(1) of the VPPA provides that, absent the consumer's prior informed, written consent, any "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C. § 2710(b)(1), damages in the amount of $2,500.00, *see id.* § 2710(c).

6.      Accordingly, on behalf of themselves and the putative Class members defined below, Plaintiffs bring this Class Action Complaint against Defendant for intentionally and unlawfully disclosing their Personal Viewing Information to Meta.

## PARTIES

I.     **Plaintiff Fosudo**

7.     Plaintiff Fosudo is, and at all times relevant hereto was, a citizen and resident of Howard County in Columbia, Maryland.

8.     Plaintiff Fosudo is, and at all times relevant hereto was, a user of Meta.

9.     On or about December 2, 2024, Plaintiff Fosudo purchased prerecorded video material from Defendant by requesting and paying for such material on Defendant's website, www.walmart.com, and by providing her name, email address, and home address for shipment of such material.  Accordingly, Plaintiff Fosudo requested or obtained, and is therefore a consumer of, prerecorded video material sold by Defendant on its website.

10.     At all times relevant hereto, including when purchasing prerecorded video material from Defendant on its website, Plaintiff Fosudo had a Meta account, a Meta profile, and an FID associated with such profile.

11.     When Plaintiff Fosudo purchased prerecorded video material from Defendant on its website, Defendant disclosed to Meta Plaintiff Fosudo's FID coupled with the specific title of the video she purchased (as well as the URL where such video is available for purchase), among other information concerning Plaintiff Fosudo and the device on which she used to make the purchase.

12.     Plaintiff Fosudo has never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Personal Viewing Information to Meta.  In fact, Defendant never even provided Plaintiff Fosudo with written notice of its practices of disclosing its customers' Personal Viewing Information to third parties such as Meta.

13.     Because Defendant disclosed Plaintiff Fosudo's Private Viewing Information

(including her FID, the title of the prerecorded video material she purchased from Defendant's website, and the URL where such video is available for purchase) to Meta during the applicable statutory period, Defendant violated Plaintiff Fosudo's rights under the VPPA and invaded her statutorily conferred interest in keeping such information (which bears on her personal affairs and concerns) private.

## II.    Plaintiff Brown

14.    Plaintiff Brown is, and at all times relevant hereto was, a citizen and resident of Chelan County in Wenatchee, Washington.

15.    Plaintiff Brown is, and at all times relevant hereto was, a user of Meta.

16.    On or about December 23, 2022, Plaintiff Brown purchased prerecorded video material from Defendant by requesting and paying for such material on Defendant's website, www.walmart.com, and by providing her name, email address, and home address for shipment of such material.  Accordingly, Plaintiff Brown requested or obtained, and is therefore a consumer of, prerecorded video material sold by Defendant on its website.

17.    At all times relevant hereto, including when purchasing prerecorded video material from Defendant on its website, Plaintiff Brown had a Meta account, a Meta profile, and an FID associated with such profile.

18.    When Plaintiff Brown purchased prerecorded video material from Defendant on its website, Defendant disclosed to Meta Plaintiff Brown's FID coupled with the specific title of the video she purchased (as well as the URL where such video is available for purchase), among other information concerning Plaintiff Brown and the device on which she used to make the purchase.

19.    Plaintiff Brown has never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Personal Viewing Information to Meta.  In fact, Defendant never even

provided Plaintiff Brown with written notice of its practices of disclosing its customers' Personal Viewing Information to third parties such as Meta.

20.     Because Defendant disclosed Plaintiff Brown's Private Viewing Information (including her FID, the title of the prerecorded video material she purchased from Defendant's website, and the URL where such video is available for purchase) to Meta during the applicable statutory period, Defendant violated Plaintiff Brown's rights under the VPPA and invaded her statutorily conferred interest in keeping such information (which bears on her personal affairs and concerns) private.

### III.   Plaintiff Musick

21.     Plaintiff Musick is, and at all times relevant hereto was, a citizen and resident of Tallapoosa County in Alexander City, Alabama.

22.     Plaintiff Musick is, and at all times relevant hereto was, a user of Meta.

23.     On or about December 28, 2023, Plaintiff Musick purchased prerecorded video material from Defendant by requesting and paying for such material on Defendant's website, www.walmart.com, and by providing her name, email address, and home address for shipment of such material.  Accordingly, Plaintiff Musick requested or obtained, and is therefore a consumer of, prerecorded video material sold by Defendant on its website.

24.     At all times relevant hereto, including when purchasing prerecorded video material from Defendant on its website, Plaintiff Musick had a Meta account, a Meta profile, and an FID associated with such profile.

25.     When Plaintiff Musick purchased prerecorded video material from Defendant on its website, Defendant disclosed to Meta Plaintiff Musick's FID coupled with the specific title of the video she purchased (as well as the URL where such video is available for purchase), among

other information concerning Plaintiff Musick and the device on which she used to make the purchase.

26.     Plaintiff Musick has never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Personal Viewing Information to Meta.  In fact, Defendant never even provided Plaintiff Musick with written notice of its practices of disclosing its customers' Personal Viewing Information to third parties such as Meta.

27.     Because Defendant disclosed Plaintiff Musick's Private Viewing Information (including her FID, the title of the prerecorded video material she purchased from Defendant's website, and the URL where such video is available for purchase) to Meta during the applicable statutory period, Defendant violated Plaintiff Musick's rights under the VPPA and invaded her statutorily conferred interest in keeping such information (which bears on her personal affairs and concerns) private.

**IV.   Defendant Walmart, Inc.**

28.     Defendant is a Delaware corporation that maintains its headquarters in Bentonville, Arkansas. Defendant operates online and physical stores across the United States and internationally where it is engaged in the business of selling, *inter alia*, a wide variety of movies, television shows, and other prerecorded video materials to consumers.

**JURISDICTION AND VENUE**

29.     The Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2710.

30.     Personal jurisdiction and venue are proper because Defendant maintains its headquarters and principal place of business in Bentonville, Arkansas, within this judicial District.

## VIDEO PRIVACY PROTECTION ACT

31. Generally speaking, the VPPA prohibits companies (like Defendant) from knowingly disclosing to third parties (like Meta) information that personally identifies consumers (like Plaintiffs) as having viewed particular videos or other audio-visual materials.

32. Specifically, subject to certain exceptions that do not apply here, the VPPA prohibits "a video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]" 18 U.S.C. § 2710(b)(1). The statute defines a "video tape service provider" as "any person, engaged in the business…of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), and defines a "consumer" as "a renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). "'[P]ersonally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

33. Leading up to the VPPA's enactment in 1988, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." *Id.* Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials because such records offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

34.     Thus, in proposing the Video and Library Privacy Protection Act (which later became the VPPA), Senator Patrick J. Leahy (the senior Senator from Vermont from 1975 to 2023) sought to codify, as a matter of law, that "our right to privacy protects the choice of movies that we watch with our family in our own homes." 134 Cong. Rec. S5399 (May 10, 1988).  As Senator Leahy explained at the time, the personal nature of such information, and the need to protect it from disclosure, is the raison d'être of the statute: "These activities are at the core of any definition of personhood.  They reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people." *Id*.

35.     While these statements rang true in 1988 when the act was passed, the importance of legislation like the VPPA in the modern era of data mining is more pronounced than ever before. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[1]

36.     Former Senator Al Franken may have said it best: "If someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that consumers have the

---

[1]     The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary. senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21stcentury.

right to easily control who finds out what they watch—and who doesn't. The Video Privacy Protection Act guarantees them that right."[2]

37.     In this case, however, Defendant deprived Plaintiffs and numerous other similarly situated persons of that right by systematically (and surreptitiously) disclosing their Personal Viewing Information to Meta, without providing notice to (let alone obtaining consent from) any of them, as explained in detail below.

## BACKGROUND FACTS

### I.     Consumers' Personal Information Has Real Market Value

38.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[3]

39.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a 26 billion dollar per year online advertising industry in the United States.[4]

40.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount
> of information collected by businesses, or why their information

---

[2]     Chairman Franken Holds Hearing on Updated Video Privacy Law for 21st Century, frank.senate.gov (Jan. 31, 2012).

[3]     FCC, *The Information Marketplace* (Mar. 13, 2001), at 8-11, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

[4]     *See Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html.

may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[5]

41. In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers. Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[6]

42. The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[7]

43. Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[8]

44. Recognizing the severe threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-chairmen of the Congressional Bi-Partisan Privacy Caucus sent

---

[5] Statement of FTC Cmr. Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

[6] *See* M. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/.

[7] N. Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of- consumer-database-marketing.html.

[8] Letter from Sen. J. Rockefeller IV, Sen. Cmtee. on Commerce, Science, and Transportation, to S. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c.

a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data, stating in pertinent part:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[9]

45. Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers. In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[10] including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like Walmart share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[11]

46. Disclosures like Defendant's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[12] The

---

[9]    *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Sen. Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information.

[10]    *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

[11]    *See* Charles Duhigg, *Bilking the Elderly, with a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited July 30, 2021).

[12]    *Id.*

FTC notes that "[t]she elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[13]

47.     Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.  Thus, information disclosures like Defendant's are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[14]

48.     Defendant is not alone in violating its customers' statutory rights and jeopardizing their well-being in exchange for increased revenue: disclosing customer and subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties has become a widespread practice.  Unfortunately for consumers, however, this growth has come at the expense of their most basic privacy rights.

## II.     Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases

49.     As the data aggregation industry has grown, so has consumer concerns regarding personal information.

50.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not

---

[13]     *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf.

[14]     *Id.*

protect their privacy online.[15]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[16]

51.     Thus, as consumer privacy concerns grow, consumers increasingly incorporate privacy concerns and values into their purchasing decisions, and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

52.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[17]

53.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[18]

54.     Thus, in today's digital economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[19]  As such, where a business

---

[15]     *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf.

[16]     *Id.*

[17]     *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html.

[18]     *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at*      https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy.

[19]     *See* Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Oct.        2003)        at        2,        *available        at*

offers customers a product or service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a product or service of less value than the product or service paid for.

### III. Defendant Uses the Meta Pixel to Systematically Disclose its Customers' Personal Viewing Information to Meta

55.    As alleged below, whenever a person with a Meta account purchases prerecorded video material from Defendant on its website, the Meta Pixel technology that Defendant intentionally installed on its website transmits the customer's personally identifying information and detailed Private Viewing Information (revealing the specific titles of the prerecorded video material that he or she purchased) to Meta – all without the customer's consent, and in clear violation of the VPPA.

### A.  The Meta Pixel

56.    On February 4, 2004, Mark Zuckerberg and others launched Facebook, now known as "Meta".[20]  Meta is now the world's largest social media platform. To create a Meta account, a person must provide, *inter alia*, his or her first and last name, birth date, gender, and phone number or email address.

57.    The Meta Pixel, first introduced in 2013 as the "Facebook Pixel," is a unique string of code that companies can embed on their websites to monitor and track the actions taken by visitors to their websites and to report them back to Meta. This allows companies like Defendant to build detailed profiles about their customers and to serve them with highly targeted advertising.

58.    Additionally, a Meta Pixel installed on a company's website allows Meta "to match

---

http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf ("It is obvious that people value online privacy.").

[20]    Company Info, FACEBOOK, https://about.fb.com/company-info./.

. . . website visitors to their respective [Meta] User accounts."[21] This is because Meta has assigned to each of its users an "FID" number – a unique and persistent identifier that allows anyone to look up the user's unique Meta profile and thus identify the user by name[22] – and because each transmission of information made from a company's website to Meta via the Meta Pixel is accompanied by, *inter alia*, the FID of the website's visitor. Moreover, the Meta Pixel can follow a consumer to different websites and across the Internet even after the consumer's browser history has been cleared.

59.     Meta has used the Meta Pixel to amass a vast digital database of dossiers comprised of highly detailed personally identifying information about each of its billions of users worldwide, including information about all of its users' interactions with any of the millions of websites across the Internet on which the Meta Pixel is installed. Meta then monetizes this Orwellian database by selling advertisers the ability to serve highly targeted advertisements to the persons whose personal information is contained within it.

60.     Simply put, if a company chooses to install the Meta Pixel on its website, both the company who installed it and Meta (the recipient of the information it transmits) are then able to "track[] the people and type of actions they take,"[23] including, as relevant here, the specific prerecorded video material that they purchase on the website.

---

[21]     https://developers.facebook.com/docs/meta-pixel/get-started.

[22]     For example, Mark Zuckerberg's FID is reportedly the number "4," so logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck, and all of the additional personally identifiable information contained therein.

[23]     https://www.facebook.com/business/goals/retargeting.

**B. Defendant Knowingly Uses the Meta Pixel to Transmit the Private Viewing Information of its Customers to Meta**

61.     Defendant sells a wide variety of prerecorded video materials, including movies and television shows, to consumers on its website www.walmart.com.

62.     To make a purchase of prerecorded video material from Defendant's website, a person must provide at least his or her name, email address, billing address, and credit or debit card (or other form of payment) information.

63.     Whenever a person with a Meta account purchases prerecorded video material from Defendant on its website, Defendant uses – and has used at all times relevant hereto – the Meta Pixel to disclose to Meta the unencrypted FID of the person who made the purchase and the specific title of video material that the person purchased (as well as the URL where such video material is available for purchase).

64.      In order to take advantage of the targeted advertising and other informational and analytical services offered by Meta, Defendant intentionally programmed its website (by following step-by-step instructions from Meta's website) to include the Meta Pixel code, which systematically transmits to Meta the FID of each person with a Meta account who purchases prerecorded video material on its website, along with the specific title of the prerecorded video material that the person purchased.

65.     With only a person's FID and the title of the prerecorded video material (or URL where such material is available for purchase) that the person purchased from Defendant on its website—all of which Defendant knowingly provides to Meta on a systematic basis—any ordinary person could learn the identity of the person to whom the FID corresponds and the title of the specific prerecorded video material that the person purchased (and thus requested and obtained).

This can be accomplished simply by accessing the URL www.facebook.com/[*insert the person's FID here*]/.

66.     Defendant's practices of disclosing the Private Viewing Information of its customers to Meta continued unabated for the duration of the two-year period preceding the filing of this action.   At all times relevant hereto, whenever one of the Plaintiffs or any other person purchased prerecorded video material from Defendant on its website, Defendant disclosed to Meta (*inter alia*) the specific title of the video material that was purchased (including the URL where such material is available for purchase), along with the FID of the person who purchased it (which, as discussed above, uniquely identified the person).

67.     At all times relevant hereto, Defendant knew that the Meta Pixel was disclosing its customers' Private Viewing Information to Meta.

68.     Although Defendant could easily have programmed its website so that none of its customers' Private Viewing Information is disclosed to Meta, Defendant instead chose to program its website so that all of its customers' Private Viewing Information is disclosed to Meta.

69.     Before transmitting its customers' Private Viewing Information to Meta, Defendant failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

70.     By intentionally disclosing to Meta each of the Plaintiffs' and its other customers' FIDs together with the specific video material that they each purchased, without any of their consent to these practices, Defendant knowingly violated the VPPA on an enormous scale.

**CLASS ACTION ALLEGATIONS**

71.     Plaintiffs seek to represent a class defined as all persons in the United States who, during the two years preceding the filing of this action, purchased prerecorded video material from

Defendant's www.walmart.com website while maintaining an account with Meta Platforms, Inc. f/k/a Facebook, Inc.

72.     Class members are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in at least the tens of thousands.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the membership records of Defendant.

73.     Common questions of law and fact exist for all Class members and predominate over questions affecting only individual class members. Common legal and factual questions include but are not limited to (a) whether the Defendant embedded Meta Pixel on their website that monitors and tracks actions taken by visitors to their websites; (b) whether the Defendant reports the actions and information of visitors to Meta; (c) whether Defendant knowingly disclosed Plaintiffs' and Class members' Private Viewing Information to Meta;  (d) whether Defendant's conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710; and (e) whether each of the Plaintiffs and Class members is entitled to a statutory damage award of $2,500, as provided by the VPPA.

74.     The named Plaintiffs' claims are typical of the claims of the Class in that the Defendants' conduct toward the putative class is the same.  That is, the Defendant embedded Meta Pixel on their website to monitor and track actions taken by class members to their website and report this to Meta.  Further, the named Plaintiffs and the Class members suffered invasions of their statutorily protected right to privacy (as afforded by the VPPA), as well as intrusions upon their private affairs and concerns that would be highly offensive to a reasonable person, as a result of Defendant's uniform and wrongful conduct in intentionally disclosing their Private Purchase

Information to Meta.

75.     Plaintiffs are adequate representatives of the Class because they are interested in the litigation; their interests do not conflict with those of the Class members they seek to represent; they have retained competent counsel experienced in prosecuting class actions and intend to prosecute this action vigorously.  Plaintiffs and their counsel will fairly and adequately protect the interests of all Class members.

76.     The class mechanism is superior to other available means for the fair and efficient adjudication of Class members' claims.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by this case's complex legal and factual issues.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication of the common questions of law and fact, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSE OF ACTION
### Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710

77.     Plaintiffs repeat the allegations asserted in the preceding paragraphs as if fully set forth herein.

78.     The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the

consumer." 18 U.S.C. § 2710.

79.     As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]" Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it is engaged in the business of selling and delivering prerecorded video materials, similar to prerecorded video cassette tapes, to consumers nationwide.

80.     As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider." As alleged above, Plaintiffs and Class members are each a "consumer" withing the meaning of the VPPA because they each purchased prerecorded video material from Defendant's website that was sold and delivered to them by Defendant.

81.     As defined in 18 U.S.C. § 2710(a)(3), a "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." The Private Viewing Information that Defendant transmitted to Meta constitutes "personally identifiable information" as defined in 18 U.S.C. § 2710(a)(3) because it identified each of the Plaintiffs and Class members to Meta as an individual who purchased, and thus "requested or obtained," specific prerecorded video material from Defendant via its website.

82.     Defendant knowingly disclosed Plaintiffs' and Class members' Private Viewing Information to Meta via the Meta Pixel technology because Defendant intentionally installed and programmed the Meta Pixel code on its website, knowing that such code would transmit to Meta the titles of the video materials purchased by its customers coupled with its customers' unique

identifiers (including FIDs).

83.     Defendant failed to obtain informed written consent from any of the Plaintiffs or Class members authorizing it to disclose their Private Viewing Information to Meta or any other third party. More specifically, at no time prior to or during the applicable statutory period did Defendant obtain from any person who purchased prerecorded video material on its website (including any of the Plaintiffs or Class members) informed, written consent that was given in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer, that was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner, or that was given after Defendant provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. *See* 18 U.S.C. § 2710(b)(2).

84.     By disclosing Plaintiffs' and Class members' Private Viewing Information, Defendant violated their statutorily protected right to privacy in their Private Viewing Information.

85.     Consequently, Defendant is liable to each of the Plaintiffs and Class members for damages in the statutorily set sum of $2,500. 18 U.S.C. § 2710(c)(2)(A).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek a judgment against Defendant Walmart, Inc. as follows:

  A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

  B.     For an order finding in favor of Plaintiffs and the Class and against Defendant on all counts asserted herein;

21

C.   For an award of $2,500.00 to each of the Plaintiffs and each Class
member, as provided by 18 U.S.C. § 2710(c).

Dated: July 15, 2024                          Respectfully submitted,

                                              /s/ H. Gregory Campbell

                                              _____
                                              H. Gregory Campbell (AR #92001)
                                              Campbell Law Firm, P.A.
                                              2100 Riverdale Road, Suite 200B
                                              Little Rock, AR 72202
                                              (501) 372-5659
                                              greg@gcampbell-law.com

                                              and

                                              **HEDIN LLP**
                                              FRANK S. HEDIN (FBN: 109698)
                                              (PRO HAC VICE APPLICATION TO BE FILED)
                                              ARUN G. RAVINDRAN (FBN: 66247)
                                              (PRO HAC VICE APPLICATION TO BE FILED)
                                              ELLIOT O. JACKSON (FBN: 1034536)
                                              (PRO HAC VICE APPLICATION TO BE FILED)
                                              1395 BRICKELL AVE., SUITE 610
                                              MIAMI, FLORIDA 33131-3302
                                              TELEPHONE:   (305) 357-2107
                                              FACSIMILE:   (305) 200-8801
                                              E-MAIL:      FHEDIN@HEDINLLP.COM
                                                           ARAVINDRAN@HEDINLLP.COM
                                                           EJACKSON@HEDINLLP.COM

                                              *Counsel for Plaintiffs and Putative Class*

22